IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE SUBPOENA ISSUED TO THE COMMODITY FUTURES TRADING COMMISSION | Misc. No. 06-00489<br>Judge Colleen Kollar-Kotelly |
| Kohen, *et al.*,<br><br>                    Plaintiffs,<br><br>          v.<br>Pacific Investment Management Company, LLC, PIMCO Funds, and John Does 1-100,<br>                    Defendants. | No. 05 C 4681 (N.D. Ill.)<br>Judge Ronald A. Guzman<br>Magistrate Michael T. Mason |

**COMMODITY FUTURES TRADING COMMISSION'S
POSITION STATEMENT**

In September 2006, plaintiffs in *Kohen, et al. v. Pacific Investment Management Company, LLC, et al.*, No. 05-C-4681 (N.D. Ill.) served a document subpoena on the Commission. The *Kohen* class action complaint alleges that Pacific Investment Management Company ("PIMCO") and a related entity manipulated the price of the June 2005 10-year Treasury Note futures contract traded on the Chicago Board of Trade ("CBOT"), as well as the price of the cheapest-to-deliver Treasury Note (*i.e.*, the February 2012 Note) underlying the June 2005 contract. The Commission has considered plaintiffs' subpoena as subsequently modified (described in Section II) under its *Touhy* regulations, 17 C.F.R. Part 144, and details its objections and proposed additional modifications below. *See generally United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951).

## I.    BACKGROUND

### A.    The Commission

The CFTC is an independent agency created by Congress in 1974.  The Commission's mandate is to regulate commodity futures and option markets in the United States.  *See generally* 7 U.S.C. § 2(a)(2).  The mission of the CFTC is to protect market users and the public from fraud, manipulation, and abusive practices related to the sale of commodity and financial futures and options, and to foster open, competitive, and financially sound futures and option markets.  *See* 7 U.S.C. § 5(b).

The records subject to the *Kohen* subpoena are collected by the Commission's Division of Market Oversight ("DMO").[1]  In general, DMO has regulatory responsibility for oversight of registered futures exchanges and derivatives transaction execution facilities.  DMO also is responsible for market surveillance.  This function is accomplished by, *inter alia*, collecting and reviewing market position and transaction data, and surveying market participants.[2]

### B.    The Ten Year Treasury Note Futures Contracts

#### 1.    General description of the contract

The CBOT lists a future contract on the Ten Year United States Treasury Note for the months of March, June, September, and December.  The contract

---

[1] For a detailed discussion on the Commission's operations, see http://www.cftc.gov/cftc/cftcabout.htm?from=home&page=aboutcftcleft .

[2] For a detailed discussion on the Commission's surveillance program, see http://www.cftc.gov/opa/backgrounder/opasurveill.htm .

expires on the seventh business day preceding the last business day of the delivery

month. This is also the last trading day. The last delivery day is the last business

day of the delivery month. The delivery month for the June 2005 contract was June

1, 2005 to June 30, 2005. A Treasury Note has a face amount of $100,000 or

multiple thereof.[3]

### 2. The June 2005 contract

In early August 2005, major newspapers reported that the U.S. Treasury

Department was looking into a short squeeze in the now-expired Ten Year June

2005 Treasury Note futures contract. *See* Deborah Lagomarsino, <u>Treasury</u>

<u>Department Examines Short Squeeze in Futures Contract</u>, Wall Street Journal,

August 9, 2005, C3.[4] The newspapers reported that problems in the market began

in late May 2005 when "traders who had sold the 10-year note short suddenly found

that they could no longer go into the open market and borrow the securities for

delivery to their purchasers. If sellers of a security cannot deliver it to the buyers,

the traders cannot settle. ...this is called a 'fail.'" *See* Gretchen Morgenson, <u>Was</u>

<u>Someone Squeezing Treasuries?</u>, New York Times, August 7, 2005, Section 3, 2005

WLNR 12419969. According to the New York Times, PIMCO was the largest holder

---

[3] For additional details about the terms and conditions of this contract, see
http://www.cbot.com/cbot/pub/cont_detail/1,3206,1520+14433,00.html .

[4] A squeeze causes short-sellers to pay inflated prices to cover open positions
because a significant portion of the deliverable supply is under the control of
another trader. *See CFTC Glossary: A Layman's Guide* (1991).

of the Ten-Year Treasury security, and would benefit the most from a short squeeze.
*Id.*

### C.    The *Kohen* complaint

On August 16, 2005, a single trader filed a class action alleging that PIMCO

manipulated the price of the June 2005 Ten Year Treasury Note futures contract,

and the underlying cheapest-to-deliver Treasury Note in violation of Sections 9(a)

and 22(a) of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 13(a), 25(a).  The

First Amended Complaint filed in May 2006 further asserted that PIMCO had

created a "short squeeze," and caused an inordinate number of "fails" in the

repurchase agreement market.  *See Kohen, et al. v. Pacific Investment Management*

*Company, LLC, et al.*, Civ. No. 05-4681 (N.D. Ill.) [Docket No. 80] at ¶¶ 5-13, 102,

attached hereto as Exhibit A.  Plaintiffs are seeking actual damages.  *Id.* at p. 21-

22.

## II.    PLAINTIFFS' MODIFIED SUBPOENA REQUESTS

The *Kohen* plaintiffs have agreed to several modifications to the subpoena,

which as of the date of this filing would limit production by the Commission to the

following:

1. large trader reports, without any form of masking of traders'
   identities, for the June 2005 Ten Year Treasury Note futures
   contract that were filed with the Commission between the period
   March 1, 2005 and June 30, 2005, produced pursuant to a
   protective order that limits disclosure to attorneys and experts
   only;

2. daily transactional logs for trading for the June 2005 Ten Year
   Treasury Note futures contract between the period March 1, 2005
   to June 30, 2005, coded and masked, so that the identities of
   market participants, other than PIMCO, are coded, and produced

pursuant to a protective order that limits disclosure to attorneys and experts only; and

3. surveillance communications regarding the June 2005 Ten Year Treasury Note futures contract between Commission employees and PIMCO representatives during the period March 1, 2005 to June 30, 2005.

## III.    THE COMMISSION'S POSITION

### A.    Trading Data Generally

As reflected in Section 8(a)(1) of the CEA, 7 U.S.C. § 12(a)(1), the trading data the Commission collects as part of its regulatory and enforcement functions is highly sensitive.  The relevant portion of 7 U.S.C. § 12(a)(1) reads:

> The Commission may publish from time to time the results of any such investigation and such general statistical information gathered therefrom as it deems of interest to the public: *Provided,* That except as otherwise specifically authorized in this Act [7 USC §§ 1 et seq.], the Commission may not publish data and information that would separately disclose the business transactions or market positions of any person and trade secrets or names of customers: *Provided further,* That the Commission may withhold from public disclosure any data or information concerning or obtained in connection with any pending investigation of any person.

The Court of Appeals for this Circuit explained in 1968 that the provisions of Section 8(a) are designed to provide a needed element of secrecy to traders, both hedgers and speculators.  *See Freeman v. Seligson,* 405 F.2d 1326, 1350 (D.C. Cir. 1968).  In *Friedman v. Bache Halsey Shields, Inc.,* 738 F.2d 1336, 1343 (D.C. Cir. 1984), the court of appeals reiterated that CEA Section 8(a) permits the Commission to withhold data and information from public disclosure.  The Commission recognizes, however, that the publication bar in Section 8(a) does not apply to "discovery requested pursuant to rules 26 and 45" of the Federal Rules of

Civil Procedure. *Id.* Rather, as the *Friedman* court explained, the disclosure of information in a court proceeding is based on "the relative weight of the claimant's need and the government's interest in confidentiality." *See Friedman*, 738 F.2d at 1344.

### 1. Large trader reports

#### a. Generally

At the heart of the Commission's surveillance system is a large-trader reporting system. *See* 17 C.F.R. Parts 15-19, 21. Under this system, clearing members, futures commission merchants, and foreign brokers (collectively called "reporting firms") electronically file daily reports with the Commission. *See* 17 C.F.R. Part 17.[5] These reports contain the futures and option positions of traders that hold positions above specific reporting levels set by CFTC regulations. *See* 17 C.F.R. Part 15. The reportable limit for the Ten Year Treasury Note is 2000 contracts. The aggregate of all large-traders' positions reported to the Commission usually represents 70 to 90 percent of the total open interest in any given market.[6]

#### b. The Commission's position on the production of large trader reports for the June 2005 Ten Year Treasury Note futures contract

As described above, plaintiffs in the *Kohen* case have agreed to modify the request for large trader reports to limit it to the June 2005 futures contract for the

---

[5] While the large trader information is now collected by the Commission via an electronic data feed, the type of information collected is specified in CFTC Form '01. A copy is attached hereto as <u>Exhibit B</u>.

[6] *See* http://www.cftc.gov/opa/backgrounder/opa-ltrs.htm .

period March 1, 2005 to June 30, 2005, and to limit access, pursuant to protective

order, to attorneys and experts eyes only.[7]

To the extent that the *Kohen* plaintiffs seek trader identities as part of a

production of large trader reports, the Commission objects. Accordingly, the

Commission is amenable to the production of large trader reports with two further

modifications:

- First, the Commission is prepared to produce the requested reports
  with the traders' identities concealed by coding; and

- Second, the Commission is prepared to allow plaintiffs to return to the
  Commission to request the identity of a trader or traders, if an identity
  is needed. Following a specific identity request, the Commission
  would notify the trader of the request before deciding whether to
  produce the trader's identity or object to the disclosure of the identity.

These additional proposed limitations on the production of the large trader reports

are based, in part, on the generality of the reasons plaintiffs have advanced for their

claim of need for trader identities. *See* Plaintiffs' Opposition to Citadel Investment

Group, L.L.C.'s Motion to Quash [Docket No. 3] at p. 7.

Plaintiffs' principal justification for that claim appears to be that the

information is needed to assist in "identification of class members and the required

sending of class notice to class members." *Id.* This explanation is unpersuasive, in

part, because the period that defines the class composition is inconsistent with the

---

[7] Subpoena Request No. 1, as originally served, sought large trader reports for all
market participants in the March, June, September, and December 2005 Ten Year
Treasury Notes futures contracts for the period January 2005 to September 2005.
Subpoena Requests Nos. 2, 6, 10, 12, 13, and 22 sought information captured in the
large trader reports. A copy of the *Kohen* subpoena is attached to Citadel
Investment Group, L.L.C.'s Motion to Quash [Docket No. 1].

period for which plaintiffs seek large trader reports.  Plaintiffs define the class as comprised of traders who were in the June 2005 futures contract market between May 9, 2005 and June 30, 2005.  *See* Exhibit A at ¶ 94.  In contrast, the large trader reports sought by plaintiffs from the Commission cover a greater period of almost 120 days (*i.e.*, March 1 to June 30, 2005), and would mean that plaintiffs would receive the trader identities of every large trader for that four-month period.  Given that these periods do not match, it is difficult to accept plaintiffs' explanation that large trader reports should be unmasked and uncoded.

Moreover, the actual identities, as opposed to coded identities as the Commission here urges, are not plainly necessary for either the damages modeling or the determination of the extent of market concentration, which are also grounds advanced by the plaintiffs.[8]

The Commission believes that the further modifications it recommends here address plaintiffs' actual need for large trader reports and reduce the likelihood of harm that might occur with the disclosure of trader identities and position information.  The two-step process the Commission recommends would give traders the opportunity to object to identification if plaintiffs seek any trader's identity in a more focused context.

Finally, market participants, specifically Citadel, argue that trading strategies and identities could be deduced and thus harm them even from coded

---

[8] To the extent plaintiffs determine that identities of particular traders are later needed, the Commission's proposal provides a mechanism for plaintiffs to obtain them.

data. *See* Citadel Investment Group, L.L.C. Reply to Plaintiffs' Opposition to

Citadel Investment Group, L.L.C.'s Motion to Quash [Docket No. 6] at 4-5. Market

participants also argue that the proposed more restrictive protective order

provisions are not foolproof. *See* Citadel Investment Group, L.L.C.'s Reply to

Plaintiffs' Opposition to Citadel Investment Group, L.L.C.'s Motion to Quash

[Docket No. 6] at 7-8; Reply in Support of Ronin Capital, L.L.C.'s Motion to Quash

[Docket No. 9] at ¶ 2. While the Commission agrees with these arguments in the

abstract, the specific showing needed to sustain them is better obtained from the

interveners. *See Freeman,* 405 F.2d at 1351-52 (explaining that traders should

intervene to assert their positions "[i]nsofar as the interest protected by [CEA

Section 8] is business privacy (rather than the need to assure effective function and

regulation of markets)").[9]

### 2. Daily transaction logs

#### a. Generally

The Commission receives on a regular basis the daily transaction information

from the futures exchanges. In general, it consists of a record of every trade made

in a particular futures contract. The data includes the account numbers of all

---

[9] The Commission notes that the concern about trader identities as well as the
production of large trade reports may be mooted by the recent magistrate decision
in the *Kohen* case in Chicago. On December 8, the magistrate judge granted
plaintiffs' motion to compel and ordered the CBOT to produce, before December 29,
2006, large trader reports related to the June 2005 U.S. Ten Year Treasury Note
futures contract for the period between April 30 through July 10, 2005. *See* Order,
*Kohen, et al. v. Pacific Investment Management Company, LLC, et al.,* No. 05-C-
4681 (ND Ill.) [Docket No. 203]. A copy is attached as <u>Exhibit C</u>. The CBOT
collects comparable large trader data pursuant to CBOT Rule 425.01(b).

market participants, the prices at which the transaction is made, and the number of contracts involved. Accordingly, there are millions of transactions reflected in the daily transaction logs for the June 2005 Ten Year Treasury Note futures contract during the period set by the *Kohen* subpoena.[10]

### b.    Positions of interveners

In its motion to quash, the CBOT objects to the production of daily transaction logs. The CBOT has explained that plaintiffs' request seeks a substantial amount of transactional information involving open auction trades and electronic trades. *See* Chicago Board of Trade's Motion to Quash [Docket No. 11] at p. 4. The CBOT argues that the *Kohen* subpoena should be quashed because: (a) the request is overbroad and burdensome; (b) the daily transaction logs contain confidential commercial information pertaining to customers and the CBOT; (c) the plaintiffs have failed to make a showing of substantial need pursuant to Rule 45(c)(3)(B) of the Federal Rules of Civil Procedure; (d) the logs contain information irrelevant to plaintiffs' manipulation case; and (e) the plaintiffs could go directly to the traders or their clearing firms for the data. *See* Chicago Board of Trade's Motion to Quash at 4-5 [Docket No. 11].[11]

---

[10] Subpoena Request No. 9 seeks the daily transaction logs for the Ten Year Treasury Notes futures contracts for the relevant period. Subpoena Requests Nos. 5, 6-8, 12, and 13 seek information captured in the daily transaction logs.

[11] The daily transaction logs were not subject to the order or plaintiffs' motion to compel against CBOT in the *Kohen* case mentioned in footnote 9, above.

Citadel, Ronin and Lehman Brothers have argued that the production of the daily transaction data would disclose proprietary trading practices and trading strategies of market participants. *See* Citadel Reply at p. 5; Ronin Motion at ¶ 8; Lehman Brothers Objection at ¶¶ 2, 4. They also contend that the disclosure of daily transaction logs would create economic harm. *Id.*

### c. The Commission's position on the production of daily transaction logs

The Commission agrees with the CBOT that even plaintiffs' modified request seeks an enormous amount of daily transaction data for the June 2005 Ten Year Treasury Note futures contract. And the Commission agrees that the relevance of this enormous collection of data is not obvious, while the congressional determination that the data is presumptively sensitive is manifest. *See* 7 U.S.C. § 12(a)(1).

Accordingly, subject to the interveners' arguments for greater protection, the Commission believes that production of the daily transaction logs should only be done with the identities of traders concealed and coded, and under the more restrictive protective order proposed by plaintiffs. Moreover, plaintiffs should be required to specify and justify a narrower time period within the March 1 to June 30, 2005, time period.[12]

### B. Surveillance Communications between the Commission and PIMCO

---

[12] The Court should be aware that the Commission and plaintiffs are discussing narrowing the scope of the requested daily transaction logs to specific trading days.

As originally served, the *Kohen* subpoena sought documents constituting (a) communications between Commission employees; (b) communications between Commission employees and other federal regulators; (c) communications between Commission employees and the CBOT employees; and (d) communications between Commission employees and market participants.[13]

As described in Section II, the *Kohen* plaintiffs have agreed to limit their request for communications to communications between Commission employees and PIMCO. The Commission does not object to the production of documents constituting surveillance communications between Commission employees and PIMCO employees. Accordingly, the Commission is prepared to produce e-mail conversations, with and without attachments, that are responsive to plaintiffs' request.

---

[13] See *Kohen* subpoena Request Nos. 4-7, 10-13, 16-22, and 26.

**CONCLUSION**

The Commission respectfully requests that this Court issue an order that considers the Commissions' objections and establishes the recommended limitations on the production of the subpoenaed documents.

Respectfully submitted,

Glynn L. Mays, D.C. Bar # 184531
Senior Assistant General Counsel


/s/  Gloria P. Clement
Gloria P. Clement, D.C. Bar # 446163
Assistant General Counsel

COMMODITY FUTURES TRADING
COMMISSION
Office of the General Counsel
1155 21st Street, N.W.
Three Lafayette Centre
Washington, D.C.  20581
Telephone: (202) 418-5122
Facsimile: (202) 418-5424
E-mail:  gmays@cftc.gov; gclement@cftc.gov

Dated: December 13, 2006

## CERTIFICATE OF SERVICE

I, Gloria P. Clement, hereby certify that on December 13, 2006, I served a copy of the Commodity Futures Trading Commission's Position Statement and accompanying exhibits by ECF, e-mail, or facsimile on the following persons:

William J. Nissen
Eric J. Grush
Jennifer Tan
**SIDLEY AUSTIN**
One Dearborn Street
Chicago, Illinois  60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
E-mail: wnissen@sidley.com;
egrush@sidley.com; jtan@sidley.com

Counsel for PIMCO

David Kotler
**DECHERT LLP**
Princeton Pike Corporate Center
P.O. Box 5218
Princeton, New Jersey  08543
Telephone: (609) 620-3226
Facsimile: (609) 620-3259
E-mail: david.kotler@dechert.com

Counsel for PIMCO Funds

Marvin A. Miller
Anthony F. Fata
**MILLER FAUCHER AND
CAFFERTY LLP**
30 North La Salle Street, Suite 3200
Chicago, Illinois  60602
Telephone: (312) 782-4880
Facsimile: (312) 782-4485
E-mail: mmiller@millerfaucher.com;
afata@millerfaucher.com

Designated Local Counsel for Plaintiffs

Michael T. Hannafan
**MICHAEL T. HANNAFAN &
ASSOCIATEDS, LTD.**
One East Wacker Drive, Suite 1208
Chicago, Illinois  60601
Telephone: (312) 527-0055
Facsimile: (312) 527-0220
E-mail: mtf@hannafanlaw.com

Counsel for PIMCO Funds

Kevin King
**WINSTON & STRAWN LLP**
1700 K Street, N.W.
Washington, D.C.  20006
Telephone: (202) 282-5749
Facsimile: (202) 282-5100
E-mail: kking@winston.com

Counsel for Citadel Investment Group,
L.L.C.

Christopher Lovell
Gary S. Jacobson
Merrick S. Rayle
Craig Essenmacher
**LOVELL, STEWARD, HALEBIAN LLP**
500 Fifth Avenue
New York, New York  10110
Telephone: (212) 608-1900
Facsimile: (212) 718-4677
E-mail:  msrayle@sbcglobal.net

Counsel for Plaintiffs

Louis F. Burke
**LOUIS F. BURKE, P.C.**
460 Park Avenue
New York, New York 10022
Telephone: (212) 682-1700
Facsimile: (212) 808-4280
E-mail: lburke@lfblaw.com

Counsel for other Plaintiffs

Geoffrey Horn
Vince Briganti
**LOWEY DANNENBERG BEMPORAD
& SELINGER, P.C.**
One North Lexington Avenue, 11th Floor
White Plains, New York 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
E-mail: ghorn@ldbs.com;
vbriganti@ldbs.com

Counsel for other Plaintiffs

Lee Ann Russo
Karey V. Skiermont
**JONES DAY**
77 West Wacker
Chicago, Illinois 60601-1692
Telephone: (312) 782-3939
Facsimile: (312) 782-8585
E-mail: larusso@jonesday.com;
kskiermont@jonesday.com

Counsel for Lehman Brothers, Inc.

Marshall E. Hanbury
Lisa A. Dunsky
**MAYER, BROWN, ROWE & MAW, LLP**
71 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 782-0600
Facsimile: (312) 706-8626
E-mail: mhanbury@mayerbrownrowe.com;
ldunsky@mayerbrownrowe.com

Counsel for Ronin Capital, LLC

/s/ Gloria P. Clement
Gloria P. Clement

2

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

-------------------------------------------------------------------------------X

JOSEF A. KOHEN, BREAKWATER TRADING LLC, and  :
RICHARD HERSHEY,                                                      :
                                 Plaintiffs,        : **CLASS ACTION**
                                                      :
        -against-                                                     :
                                                       :  Civil Action#:
                                                       :  05C 4681 (RG)
PACIFIC INVESTMENT MANAGEMENT Company LLC,    :
PIMCO FUNDS, and John Does 1-100,                          :
                                                     : **JURY TRIAL**
                                               : **DEMANDED**
                             Defendants.           :
                                                       :

-------------------------------------------------------------------------------X

## FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs bring the Commodity Exchange Act ("CEA") action on behalf of themselves and the Class defined in ¶ 94. Plaintiffs' claims as to themselves and their own actions are based upon knowledge. All other allegations are based upon information and belief pursuant to the investigation of counsel which included (a) review of defendants' filings with governmental agencies, news articles, CBOT data, proprietary data, and other statistics, (b) interviews of market participants, and (c) and other steps. As and for their Complaint, plaintiffs allege as follows:

## I.      SUMMARY OF ALLEGATIONS

1. (a) Between 2000 and 2004, the volume and open interest of Chicago Board of Trade Ten Year Treasury Note futures contract trading steadily increased while the "float" (or readily available trading supply) of deliverable notes remained constant or somewhat declined.

(b) By late 2004 and 2005, this growing imbalance made such Ten Year Treasury Note futures contracts much more susceptible to manipulation by a person who controlled large long

positions, refused to liquidate such long positions, and otherwise exacerbated an imbalance between the volume of futures contracts and the readily available supply of notes to deliver thereunder.

2.  With knowledge of the foregoing, Pacific Investment Management Company LLC (hereinafter "PIMCO") dramatically changed its prior behavior in late 2004 and 2005.

3.  First, PIMCO engaged in the highly unusual conduct of purchasing, by March 31, 2005, an extraordinarily large long position of in excess of $16,000,000,000 worth of the June 2005 Ten Year Treasury Note futures contract (sometimes referred to as "June contract").

4.  Second, as the open interest in the June contract plunged by 70% during a short time in May and June 2005, PIMCO engaged in the highly unusual conduct of not commensurately (or at all) liquidating its extraordinary June contract long positions.

5.  Third, during the time from April 1 until end of June 2005, PIMCO engaged in the highly unusual conduct of  purchasing an extraordinarily large holding, $13.3 billion worth, of the U.S. Treasury note that was the cheapest to deliver on the June contract.

6.  As a result of all this highly unusual conduct, (a) PIMCO held a substantial portion of the open interest in the June contract from late May 2005 forward; (b) during June 2005, this portion grew to in excess of 60% of the open June contracts; and (c) by the end of the June contract, PIMCO's holding of the cheapest to deliver note constituted between in excess of 75% and 90% of the float (i.e., the readily available trading supply) in such note.

7.  PIMCO's foregoing highly unusual conduct manipulated the prices of the June contract to artificially high levels and increased the volatility of prices of the June contract during May and June 2005.

8.  Such conduct was also a cause of a number of additional highly unusual occurrences indicative of June futures contract price artificiality.  These included: (a) an extremely high number of "fails" occurred in the repo market for the cheapest to deliver note on the June contract; (b) such note traded "special" at substantial premiums; (c) normal price relationships between the note and other notes were thrown out of line; and (d) various regulatory changes were enacted to prevent PIMCO from repeating its highly unusual conduct, e.g., the Chicago Board of Trade placed a maximum limit on positions of 50,000 contracts and the U.S. Treasury required position reports  from persons holding in excess of $2,000,000,000 in any note issue.

9.  Although the new 50,000 contracts limit is an enormous position, it is less than 33 1/3% of the known long position in the June contract that PIMCO held.  Although $2,000,000,000 is a large note position, PIMCO held almost six times that amount after its corner of the cheapest to deliver note on the June contract.

10.  From June 2005 forward, market participants have claimed that a short squeeze had occurred, and the United States Treasury and possibly others have begun to investigate whether a squeeze in the cheapest to deliver notes did occur.

11.  As the holder of an extraordinarily large long position in the June contract as well as significant portions of a deliverable supply, PIMCO had important responsibilities and duties to the market including duties to make its holdings of cheapest to deliver notes available and to liquidate its futures contracts.  PIMCO intentionally failed to observe these duties and responsibilities. On the contrary, PIMCO intentionally exacerbated the conditions to inflate prices.

12.  After the June contract finished trading, PIMCO, per its CEO, sought to explain

PIMCO's highly unusual conduct by stating that PIMCO would **continue** to hold for investment its extraordinary concentrated position in the illiquid note which was then no longer deliverable. But PIMCO turned around and sold (or was already selling) all of its holdings of such note in order to "bury the corpse" of its manipulation of the June contract by September 30, 2005.

13.  PIMCO intended to and did manipulate prices of the June contract to artificially high levels during the Class Period.  Plaintiffs held short positions in the June contract during the Class Period and purchased back such June contracts at the artificially high prices caused by PIMCO's highly unusual behavior during the Class Period.  PIMCO's unlawful conduct caused damages to plaintiffs.

## II.  JURISDICTION AND VENUE

14.  A United States Treasury note with a maturity between 6.5 and 10 years  ("Treasury note") is a "commodity" and is the "commodity underlying" 10-year Treasury note futures contracts traded on the Board of Trade of the City of Chicago ("CBOT").  See Sections 1a(4) and 22 of the CEA, 7 U.S.C. §§ 1a(4) and 25(a)(1)(D), respectively.

15.  This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. § 25, and 28 U.S.C. §§ 1331 and 1337.

16.  The CBOT is located at 141 West Jackson Boulevard, Chicago, Illinois  60604.  Venue is proper in this District pursuant to Section 22 of the CEA, 7 U.S.C. § 25(c), because the claims arose in this District.  Defendants' unlawful acts manipulated the prices of the June 2005 and 10- year Treasury notes futures contract traded on the CBOT.

17.  The defendants, directly and indirectly, made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the

4

mails in the connection with the unlawful acts and practices and course of business alleged herein.

## III.   PARTIES

*Plaintiffs*

18.  During and before the Class Period, plaintiff Josef Kohen sold short June contracts. During the Class Period, Kohen liquidated or purchased back these contracts at a loss.

19.  During the Class Period, plaintiff Richard Hershey purchased a June 10-year Treasury notes futures contract to liquidate a short position, and incurred a loss on the transaction.

20.  During and before the Class Period, plaintiff Breakwater Trading LLC, sold a very large short position of in excess of 10,000 June 10-year Treasury note futures contracts.  During the Class Period, it purchased June contracts in order to liquidate its short positions, and incurred a loss on such transactions.

21.  The prices that plaintiffs paid to purchase back June contracts during the Class Period were artificially high and caused losses and damages to each plaintiff.

*Defendant*

22.  Pacific Investment Management Company LLC (hereinafter "PIMCO") is an institutional money manager specializing in fixed income management.  PIMCO is incorporated in the state of Delaware and is headquartered in Newport Beach, California. PIMCO manages the largest investment company bond funds in the U.S

23.  PIMCO Funds is a Massachusetts trust and registered open end management investment company consisting of separate portfolios.  Such portfolios include the Total Return

5

Fund and other funds alleged herein.   PIMCO, through William Gross and various other

persons, caused PIMCO Funds to purchase the aggregate Ten Year Treasury Note futures

contract positions and aggregate February 2012 U.S. Treasury Note holdings alleged herein.

Because PIMCO managed and controlled PIMCO Funds and caused PIMCO Funds' conduct at

issue herein, PIMCO and PIMCO Funds are referred to collectively in this complaint as

"PIMCO".

24.  PIMCO spoke to other market participants and acted through or with its associate

John Doe defendants whose identities are unknown to plaintiffs.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   Background

25.   The CBOT has been designated by the CFTC as a contract market pursuant to

Section 5 of the CEA, 7 U.S.C. § 7.  The CBOT submits to the CFTC for approval various rules

and regulations through which the CBOT designs and creates the terms of various commodity

futures contracts, and conducts trading in such contracts. A key purpose of the CBOT rules and

amendments is to prevent price manipulation.

26.  Included in the CBOT contracts are futures contracts for Ten Year Treasury Note

futures contracts.   The CBOT defines 10-year Treasury note futures contracts as "10 Year

Treasury Note Futures."  The CBOT rules refer to them as "Long Term T-Notes."

27.  The futures contract is a firm commitment to make or accept delivery of a specified

quantity and quality of a commodity during a specific month in the future at a price agreed upon

at the time the commitment is made.  There are two sides to a futures contract.  The "long" side

is the buyer of the contract and is obligated to take delivery and pay for the commodity.  The "short" side is the seller of the contract and is obligated to make delivery of the commodity.

28.  Futures contracts are standardized according to the terms specified by the CBOT or the other commodity exchange which creates the contract.  This standardization makes such contracts fungible.

29.  Upon acceptance of any trade in the fungible contracts on the CBOT, the CBOT clearinghouse effectively becomes the seller to every buyer of a CBOT futures contract and the buyer to every seller.  Futures markets, the standardized and fungible futures contracts, and the mechanism of the clearing house to hold the other side of every futures contract, are specifically designed to facilitate and ease trading in one central market place by traders who are located throughout the world.

30.  Thus, deliveries on futures contracts are very rare and less than 1% of all futures contracts traded each year result in delivery of the underling commodities.  Instead, traders generally offset their futures positions before their contracts mature.  For example, a purchaser of one June Ten Year Treasury Note futures contract can balance (usually called "liquidate" or "cancel" or "offset") his future obligation to the exchange clearing house to take delivery of the note by selling a June Treasury futures contract.  The difference between the initial purchase price and the price of the "liquidating" sale represents the realized profit or loss for the holding of 99%-plus of the long side of the futures contracts traded.

31. The amount of contracts open to the clearinghouse is referred to as the "open interest".  Absent more liquidations through trading, the open interest in a given contract, represents the number of deliveries that will have to be made and taken.

**B.    The Ten Year Treasury Note Futures  Contract Was Susceptible to Manipulation**

32.  The CBOT Ten Year Treasury Note futures contract trades for delivery during the end month of each quarter (March, June, September and December) for the next twelve quarters.

33.  When delivery is called for, the rules of the CBOT specify a number of different note issues from 6 ½ years to 10 years in time until maturity that are acceptable for delivery against the 10-year Treasury note futures contract.

34.  Although multiple Treasury notes are typically deliverable against a given futures contract (e.g., the June 2005 contract), usually a single Treasury note is most economical for shorts to deliver.  This is referred to as the "cheapest to deliver" ("CTD") note.  Which note is cheapest to deliver depends on a variety of factors.  The pricing of the contract is based on a benchmark coupon rate of 6 percent.  When interest rates are below 6 percent, it is typically cheapest to deliver the note with the shortest "duration," where a note's duration depends on its coupon rate and maturity.  In the June contract, the February 2012 Treasury note was far cheaper or far less expensive than any other note.

35.  Various notes in any given issuance are not merely purchased but socked away by foreign governments, pensions and others until maturity.  Therefore, a substantial portion of the notes of any one issuance is not tradable nor readily available for trading or delivery on CBOT futures.

36.  Those contracts that are readily available for trading comprise "float" for such issue. In Ten Year Treasury Note and other financial futures, the readily deliverable supply consists of the "float" of the CTD (cheapest to deliver) note.

37.  In the June contracts, the CTD note was the February 2012 note.

38.  The CBOT rules also specify the value to be received in exchange for delivery of each deliverable treasury note.

39.  For the June 2005 Treasury Note futures contract, the cheapest to deliver  note was the U.S. Treasury Note expiring in February 2012.

40.  The last trading day in the June contract was June 21, 2005 and the last delivery day was June 30, 2005.  The first delivery notice day was May 31, 2005.

41.  In financial futures contracts (such as Treasury Note futures contracts) one of many forms of manipulation is to acquire a large long position and fail to liquidate or trade out of the position as the open interest declines.

42.  Between 2000 and the second half of 2004, the volume and open interest of Treasury Note futures contract trading expanded significantly.

43.  This great expansion in open interest and trading made it easier for someone to do the following: (1) purchase a large long futures contract position, (2) fail to liquidate such position when the tipping point in the contract was reached and the open interest began to decline, and (3) otherwise act to inflate manipulate prices.

44.  CBOT Ten Year Treasury Note Futures contracts have become more susceptible to manipulation when, for example, a trader can acquire an enormous long position and demand more deliveries than can reasonably be commercially made in the cheapest to deliver note on such futures contract.

45.  During 2004-2005, PIMCO, per William Gross and others, was well aware of the foregoing.

C.    **Chronology**

9

### i.    PIMCO's Holding During 2000-September 2004

46.   From March 2000 until the present, there have been liquidity, dislocation and other risks that have made it undesirable to purchase a concentrated position in any single issue of ten year notes, i.e., notes with a maturity 6 ½ to 10 years forward.  Thus, during the 2000-September 2004 time frame, PIMCO's largest end-of quarter holding of any one series of deliverable Treasury notes (i.e., notes of 6 ½ to 10 years), varied between from $1,350,000 and $464,000,000.

### ii.    September 2004-June 2005

48.   On September 13, 2004, various PIMCO entities agreed to pay $50,000,000 and consented to cease and desist orders and to undertake reforms of their compliance and corporate governance in order to settle charges that they willfully violated or aided and abetted violation of (a) the antifraud provisions of the Investment Advisers Act of 1940 ("IAA"); (b) Section 17(d) of the Investment Company Act of 1940 ("ICA"); (c) Section 34 (b) of the ICA; and (d) Section 204A of the IAA.  The SEC Order found that the PIMCO entities willfully violated each of the foregoing laws.

49.   On September 15, 2004, various PIMCO entities agreed to pay over $11.6 million and to undertake disclosure and compliance reforms in order to settle SEC charges that they violated (a) Section 206(2) of the IAA and Sections 12(b), 15(c), 17(d), and 34(b) of the ICA. The SEC Order found that PIMCO entities violated the foregoing sections of the law.

50.   The SEC proceedings that were settled in September 2004 ended PIMCO's enhancement of its income through market timing and expense reduction.

51.  Shortly after September 2004, PIMCO began to change dramatically its previous behavior in the U.S. Treasury Note futures markets.

52.  By March 30, 2005, PIMCO had caused to be purchased by its managed investment funds that PIMCO controlled, a total of in excess of 163,169 June 2005 United States Treasury note futures contracts.  For example, PIMCO's Total Return Fund and Total Return Fund II, both of which are managed by William Gross, then held 113,760 and 5,369 10-year Treasury note June futures contracts, respectively.  As of March 31, 2005 PIMCO's Commodity RealReturn Strategy Fund, which is managed by John Brynjolfsson, held 6,595 10-year Treasury note June futures contracts.

53.  This June contract holding was far larger than any 10-year Treasury note futures contract holding by PIMCO between 2000 and September 2004.

54.  Also, on March 30, 2005, PIMCO held a total of 35,700,000 Treasury notes with a maturity in February 2012, with a market value $36,876,000.  This note was the cheapest to deliver note on the June 2005 contract.

55.  As at June 30, 2005, PIMCO controlled a total of 11,394,100,000 Treasury bonds with a maturity date of February 2012 in its funds and portfolios, totaling a market value of $12,098,453,822.  For example, as of June 30, 2005, the Total Return Fund and Total Return Fund II, managed by Mr. Gross, held a principal value of 9,811,800,000 and 290,500,000 Treasury notes with a maturity of February 15, 2012, respectively.  As of June 30, 2005, the Real Return Fund, which is also managed by Mr. Brunjolfsson, held a principal value of 286,100,000 Treasury notes with a maturity of February 15, 2012.

11

56.  This unprecedented, fantastical position represented approximately 45 percent of the total issue of February 2012 notes and constituted in excess of 75% of the "float" of such note. See par. 4-6 above.

57.  PIMCO's humongous, concentrated holding on June 30, 2005 of the illiquid February 2012 notes, which were then no longer deliverable on Ten Year note futures contracts, was twenty five times as large as PIMCO's next largest holding of any single issue of deliverable notes between 2000 and 2005.

58. In sum, between April 1 and June 2005, PIMCO engaged in the highly unusual conduct of purchasing and largely failing to resell (despite attractive prices) at least 11.3 billion of the CTD notes.

59.  Some substantial portion of these purchases was made while PIMCO took deliveries on the June 2005 Ten Year Treasury Notes Futures contract.  However, the information and knowledge of the more exact details of the precise timing and the precise rates and amounts of such purchases are exclusively within the possession of PIMCO.  They are not publicly available nor otherwise available to plaintiffs absent discovery.

60.  During May and early June 2005, the open interest in the June contract plummeted rapidly but PIMCO held and did not liquidate its June contract position at the same rate (or at all).  Again, the information and knowledge about the details of the precise timing and the precise rates and amounts of PIMCO's purchases, liquidations, and acceptance of deliveries on the June contract are exclusively within the possession of PIMCO.  They are not publicly available nor otherwise available to plaintiffs absent discovery.

12

61.  From at least May 9, 2005 forward, PIMCO, through its enormous June contract position and other steps, had the ability to increase and manipulate prices of June contracts. Indeed, by May 9, 2005 at the latest, PIMCO internally committed to writing its intention to use its enormous long position and significant cash market position in a way to force the cheapest to deliver note on the June contract to go "special" by not rolling the June positions into September and by standing for delivery on June contracts.  Among other statements, on May 9, PIMCO, per Chang Hong Zhu, stated: "Even if we just pulled off rolling we may be able to cause calendar to trade closer to 'historical norm' cheap level."  Also on May 9, PIMCO, per Chris Dialynas, stated: "Prefer to stand for delivery and exploit potential for front month to go on special."  As is alleged hereinafter, PIMCO's unprecedented futures and cash market holdings caused the repo market for the February 2012 notes to go "special" shortly after May 9 which further caused artificially high prices in the June contract.

62.  Between May 17 and 24, 2005, there was a pronounced rise in the prices of the June contract and of the February 2012 Note relative to comparable futures and notes.  This spike began to dissipate through the beginning of June until another, smaller spike at the very end of June.

63.  On or well before May 19, 2005, the U.S. Treasury note maturing in February 2012 became "special."  "Special" is a technical term and it refers to a sub-species of what is known as a "repurchase agreement" or "repo".

64.  A "repurchase agreement" or "repo" occurs when a Treasury note holder borrows money by selling a note to a counterparty and agreeing to buy a note back later at a slightly

higher price. Alternatively, such an agreement also occurs when an investor borrows a note, repays the loan with other notes purchased at a lower price, and then pockets the difference.

65. In a "special" repo, when one borrows a particular note from a lender, one <u>must</u> provide that specific type of note to the lender upon repayment. Typically, the reason is that such instrument is unusually scarce or valuable.

66. Between May 19 and the end of June 2005, the February 2005 note traded at least 100 basis points "special" in the repo market commencing on May 19, 2005 and continuing through the end of June.

67. The "specialness" reached 288 basis points on May 25 and 262 basis points on June 7.

68. During May and June 2005, traders who had sold the 10-year Treasury note due to mature in February 2012 found that they could not go into the open market and borrow such Note for delivery to their purchasers.

69. Billions of dollars of the 10-year Treasury repos were "failing" each day because one or more holders of the securities had stopped lending the note and there was extremely heavy demand for physical settlement.

70. A "fail" typically occurs when an investor borrows a note with the intent of selling it in the future but is unable to return the borrowed note due to scarcity of the note or other problems in the marketplace. The "fails" here are indicative of an artificial shortage of the February 2012 note, <u>i.e.</u>, the cheapest to deliver note on the June contract.

14

71. Usually only *exogenous* events cause these types of "fails" in the marketplace. For example, one of the largest spikes in "fails" occurred in response to the September 11, 2001 terrorist attacks.

72. No such exogenous event occurred in May and June 2005. However, PIMCO's highly unusual conduct was then occurring within the market.

73. Further, during May and June 2005, the volatility of June 2005 Treasury Note futures contract prices greatly increased.

74. From May 18 until May 25, the open interest in the June contract fell 53 percent. From May 18 until June 1, 2005 the open interest fell 78 percent. The "specialness" of the February 2012 note, the inflation of its price relative to other notes, the "fails" in the note, the inflation of the June futures contract price relative to other benchmarks, and the increased volatility all coincided with PIMCO's highly unusual conduct and the tipping point when the open interest in the June contract began to decline.

75. May 31, 2005 was the first delivery notice day, June 1 was the first delivery day, and June 21, 2005 was the last trading day in the June contract. As at June 1, 2005, notwithstanding the high prices of the June contract relative to other contracts, PIMCO had failed to liquidate and still held an enormous June contract long position.

76. During June 2005, PIMCO took unusually large deliveries on its June contract rather than liquidating most of its June contracts.

77. Also, during June 2005, PIMCO engaged in the highly unusual conduct of largely failing to make the CTD note available to other market participants notwithstanding the premium prices and attractive revenues PIMCO could have gained from such sales or loans.

15

78.  On June 21, 2005, due to the cumulative effect of PIMCO's many highly unusual acts, there was a very large open interest in the June contract of 151,000 contracts.

79.  This compares, for example, to the last day of trading of the September 2005 contract, when only 66,000 contracts were open.

80.  The March 2005 contract had an unusual end of trading yet even it only had 115,000 open contracts as at the end of trading.

81.  On June 29, 2005, the CBOT announced that it was amending CBOT Regulation 425.01 to establish a 50,000 contract position limit during the last 10 trading days of the Ten Year Treasury Note contract beginning with the December 2005 expiration cycle.

82.  This maximum limit of 50,000 contracts is extraordinarily large but was less than 33 1/3% of PIMCO's known June contract long position.

83.  During June-September 2005, many market participants claimed that some one had squeezed the ten year June Ten Year Treasury Note contract and the CTD note thereunder.  In response, PIMCO, per its CEO (Mr. Gross), asserted that one reason that PIMCO purchased the highly unusual large amount of February 2012 notes is that PIMCO was going to **continue** to hold such note for investment.

84.  In fact, by September 30, 2005, PIMCO sold out all of its huge holding of this Note.  PIMCO's conduct contradicts the statements by PIMCO's CEO that PIMCO would **continue** to hold the cheapest to deliver notes after the expiration of the June contract.  Such conduct strongly suggests that PIMCO originally took the deliveries for reasons other than responsible financial investment.

85.  In August 2005, PIMCO, per its CEO, stated that another reason that PIMCO took deliveries on the June contract was that PIMCO did not like the prices required to roll into the September 2005 Ten Year Treasury Note futures contract.  To "roll", for a long like PIMCO, means to sell an existing long position and buy a later maturing futures contract, like the September or December 2005 contract.

86.  However, first, the June contract was, on an absolute basis, much more expensive than the September contract for large parts of the Class Period.  PIMCO could have "rolled" forward to September at a handsome absolute profit during this time had PIMCO truly wanted to roll forward instead of manipulating and exacerbating the conditions in the June contract.

87.  Second, the September contract called for delivery of a more valuable cheapest to deliver note.  Therefore, on a relative basis, the roll forward from the June contract to the September contract was attractive at additional other times during the Class Period.

88. Third, the September futures contract was the most liquid instrument that could be traded.  But the cheapest to deliver note on the June contract was a very illiquid instrument.  PIMCO would incur higher transaction costs to trade out of the June note (as it in fact did).

89.  Fourth, given the relative maturities and time periods, the cheapest to deliver note on the June contract could no longer be delivered on the September contract.  In other words, even if PIMCO's sole choices were to take delivery on the June contract or roll forward to September (and PIMCO had many more choices than simply these two), PIMCO chose to do the following: it took an unprecedented highly concentrated position of enormous proportions in an illiquid note that was about to lose its value rather than rolling forward into the most liquid instrument, the September futures contract as to which the deliverable instrument was more valuable.

17

90.  Fifth, there were many ways for PIMCO to maintain exposure to treasury notes or treasury note futures other than rolling into the September futures. Such ways included rolling into the December futures contract, purchasing other liquid cash notes in diversified and liquid, tradable amounts, selling the June contract, and other commercially reasonable and financially responsible steps.

91.  These steps, along with simply liquidating the June futures or selling the cheapest to deliver notes on the June futures while the prices were high, were all more attractively priced than taking huge deliveries of the illiquid cheapest deliver note that would soon no longer be deliverable in the futures contract.  But PIMCO took none of the foregoing steps.  Thus, PIMCO's conduct further contradicts the attempted explanation by PIMCO's CEO for PIMCO's highly unusual series of highly unusual actions that cornered the cheapest to deliver note.

## C.    Motive And Intent

92.  The motive and intent for the foregoing manipulative acts was to increase financial return, including but not limited to, the return from the sale of Treasury note futures positions at the artificially high prices created by manipulation.  This increased assets under management (directly and indirectly) and increases in assets under management increase PIMCO's fees.

93.  As a direct, proximate and foreseeable result of defendants' foregoing unlawful conduct, plaintiff and members of the Class have suffered damage.

## V.        CLASS ACTION ALLEGATIONS

94.  Plaintiffs, identified in paragraphs 15-18 herein, bring this action on their own behalf

and as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure

on behalf of:

> All persons who purchased, between May 9, 2005 and June 30, 2005
> ("Class Period"), inclusive, a June 10-year Treasury note futures contract in order
> to liquidate a short position, or who delivered on the June 2005 futures contract in
> order satisfy a short position (the "Class").  Excluded from the class is defendant
> and any affiliated or associated party of the defendant.

95.  This action is properly maintainable as a class action. The members of the Class are

so numerous and geographically dispersed that joinder of all Class members is impracticable.

On information and belief, there are in excess of 1,000 members in the Class and they reside in

various places throughout the United States.

96.  Questions of law and fact common to the members of the Class exist, and predominate

over questions, if any, that may affect only individual members, because defendants have acted

on grounds generally applicable to the entire Class.  The questions of law and fact common to

the Class include, but are not limited to:

(a)      whether defendants' conduct violated the CEA, as amended, 7 U.S.C. §1

*et seq.*;

(b)      whether prices of the 10-year Treasury notes, and June 10-year Treasury

note futures contracts were artificially high during the Class Period due to defendant's conduct;

(c)      what was the amount and timing of the defendants' purchases and holdings

of 10-year Treasury notes and June 10-year Treasury futures contracts during the Class Period;

19

(d)     whether and to what extent a person who liquidated their June Contract during the Class Period was injured; and

(e)     whether plaintiff and the members of the Class suffered damages as a proximate result of defendants' unlawful conduct.

97.  Plaintiffs' interests are typical of, and not antagonistic to the interests of, the Class.

98.  The plaintiffs have retained competent counsel who are experienced in class actions and commodity futures litigation.  Plaintiffs intend to prosecute this action vigorously.

99.  Defendants have acted on grounds generally applicable to the plaintiffs and the Class. Prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the defendants.

100. There are no difficulties likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.

## COUNT I

## MANIPULATION IN VIOLATION OF THE COMMODITYS EXCHANGE ACT

101. Plaintiffs repeat and re-allege the previous allegations as if fully set forth herein.

102.  Defendant's activities alleged herein created, and exacerbated conditions and artificial prices and constitute manipulation of the price of June Contracts, and the price of the CTD Treasury notes underlying those contracts, in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a), 25(a).

103.  Plaintiffs and members of the Class purchased one or more June Contracts in order to liquidate their short positions during the Class Period or make deliveries on such contract, and were injured as a result of defendants' manipulation of the price of those contracts and the price of the notes underlying those contracts, in violation of the CEA, 7 U.S.C. § 1, *et seq*.

104.  Defendants knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein.

105.  Defendants willfully intended to assist the manipulation in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

106.  Defendants and other unnamed parties including affiliates and associates of Defendants knowingly aided, abetted, counseled, induced, and/or procured or are responsible as control person for violations of the CEA alleged herein.  Does 1-100 and other unnamed parties, including affiliates and associates of Defendants, knew of Defendants' manipulation and willfully intended to assist the manipulation in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

107.  Plaintiffs and members of the Class are each entitled to actual damages for the violations of the CEA alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for relief as follows:

(A)    That the Court determine that this action may be maintained as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, that plaintiffs be denominated as Class representative and plaintiff's counsel be appointed counsel for the Class;

(B)    That plaintiffs and the Class recover actual damages, as provided by law,

determined to have been sustained for violations of the CEA, and that judgment be entered

against defendants on behalf of plaintiffs and the Class;

(C)    That plaintiffs and the Class recover their costs of the suit, including attorney's

fees; and

(D)    For such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully Submitted,

Dated:  May 30, 2005                          By /s/ Christopher Lovell
                                              Christopher Lovell, Esq.
                                              Robert W. Rodriguez, Esq.
                                              Ian T. Stoll, Esq.
                                              Craig Essenmacher, Esq.
                                              Ryan Long, Esq.
                                              **LOVELL, STEWART HALEBIAN, LLP**
                                              500 Fifth Avenue
                                              New York, New York 10110
                                              Telephone: (212) 608-1900
                                              Facsimile: (212) 719-4677

                                              *Lead Counsel*

                                              By:/s/ Marvin A. Miller
                                              Marvin A. Miller, Esq.
                                              Anthony F. Fata, Esq.
                                              **MILLER FAUCHER AND CAFFERTY LLP**
                                              30 North La Salle Street
                                              Suite 3200
                                              Chicago, Illinois 60602
                                              Telephone: (312) 782-4880
                                              Facsimile: (312) 782–4485

                                              *Designated Local Counsel*

Geoffrey Horn, Esq.
**LOWEY DANNENBERG BEMPORAD**
 **& SELINGER, P.C.**
747 Third Avenue
New York, N.Y.  10017
Telephone: (212) 759-1504
Facsimile: (212) 593-0201

Louis F. Burke, Esq.
**LOUIS F. BURKE, P.C.**
460 Park Avenue
New York, New York 10022
Telephone: (212) 682-1700
Facsimile: (212) 808–4280

*Counsel for Plaintiffs*

# Exhibit B

Special Accounts                                              **1151**

**[¶ 3559]    INSTRUCTIONS FOR PREPARING AND FILING REPORTS
ON CFTC FORM '01**

### INSTRUCTIONS FOR PREPARING AND FILING REPORTS ON CFTC FORM '01

*(See Regulations under the Commodity Exchange Act)*

Public reporting burden for this collection of information is estimated to average 5 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this, to Agency Clearance Officer, Administrative Services, Commodity Futures Trading Commission, 2033 K St. NW, Washington, DC 20581; and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503.

**WHO SHOULD REPORT:** Each futures commission merchant and foreign broker carrying a futures account for others (including officers and partners of the carrying firm) and each clearing member clearing their own trades whose open contracts in such account equal or exceed the amount fixed for reporting in any one future of a commodity. (See regulation 15.03 for reporting levels of all commodities).

**TO DETERMINE IF AN ACCOUNT IS REPORTABLE:** Combine all accounts owned or controlled by a trader and treat them as a single account of that trader. For each account, determine the net long or short position or the gross long and gross short position open in each future of a commodity on any one contract market as of the close of the market on the day of the report. Net open long or short positions should be used except for the following positions which should be gross:

1. Positions in an omnibus account

2. Positions in accounts owned or held jointly with another person or persons;

3. Positions in multiple accounts subject to trading control by the trader, and

4. Positions in accounts reported gross long and gross short to the clearinghouse of any contract market for the purpose of calculating open interest.

A position is reportable if the quantity of open contracts reaches the quantities fixed for reporting in section 15.03 of the regulations.

**WHEN TO REPORT:** Daily, after the close of the market each business day and not later than 9:00 A.M. on the following business day. Reports may be mailed by foreign brokers and futures commission merchants located outside the city where reports are to be filed, but not later then the day covered by the report.

**WHAT TO REPORT:** File a separate form for each exchange and report positions, delivery notices and exchanges of futures for cash (XFCs—also known as EFPS) as follows:

1. Position information. Show each net or gross reportable position.

2. Delivery notices. Report delivery notices issued or stopped by an account in futures for which a position is reported. When reporting delivery notices, if the notice has been issued by the clearinghouse of a contract market prior to the close of a market on any one day, the notice should be shown on that day's report. If the notice is issued by the clearinghouse on any day after the market has closed (and the notice is stopped that day or the next), the notice should be reported on the subsequent day's report.

3. XFCs. Show the transactions (buy and sell) involved with exchanges of cash for each position that is reportable.

In addition, a report showing position size, delivery notices issued or stopped or XFCs must also be filed for the first day a position goes below the reportable level.

**IDENTIFICATION OF ACCOUNTS:** Designate each account by the number assigned by you to that account. Use CFTC Form 102 for identifying the account number which appears for the first time on your report. Transmit such identification to the Commission in a separate sealed envelope marked "Confidential." It should accompany the '01 form on which the account is reported for the first time. Do not change an account number or assign it to any other trader without prior approval of the Commission.

**WHERE TO REPORT:** The Commodity Futures Trading Commission office in the city where the market is located or, if more convenient, the reports may be submitted to the Commission's New York or Chicago office.

1152  **Forms**



CFTC Form 01 (6-98)
Previous Edition of
these Forms are usable

COMMODITY FUTURES TRADING COMMISSION

COMMODITY FUTURES: POSITIONS OF SPECIAL ACCOUNTS
EXCHANGE (specify)

OMB No 3038-0009

CODE NO

REPORT AS OF CLOSE OF MARKET (DATE)

NOTICE—Failure to file a report required by the Commodity Exchange Act and the regulations thereunder or the filing of a false or fraudulent report may be a basis for administrative action under 7 U.S.C. Sec. 9, and may be punishable by fine or imprisonment, or both, under 7 U.S.C. Sec. 13, or 18 U.S.C. Sec. 1001.

List Futures separately under each account number.

©2006 CCH. All Rights Reserved.

Form 01-Flexible Options

**1155**

[¶ 3565]

# FORM 01:
## FUTURES AND OPTIONS POSITIONS OF SPECIAL ACCOUNTS (FLEXIBLE OPTIONS ONLY)

CFTC Form 01 (10-97)
Previous Edition of 01
Form is obsolete

COMMODITY FUTURES TRADING COMMISSION
FUTURES AND OPTIONS POSITIONS OF SPECIAL ACCOUNTS
(FLEXIBLE OPTIONS ONLY)

OMB No. 3038-0009

Code No.

NOTICE: Failure to file a report required by the Commodity Exchange Act and the regulations thereunder or the filing of a false or fraudulent report may be a basis for administrative action under 7 U.S.C. Sec. 9, and may be punishable by fine or imprisonment, or both, under 7 U.S.C. Sec. 1001.

| Report Date (yymmdd) | Account Number | Commodity (Exc./Code) | Exercise Style (A,E) | Expiration Date (yymmdd) | Expiration Date 2 (yymmdd) | Put/Call (P,C) | Strike Price | Long | Short | Record Type (A,C,D) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

# Exhibit C

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | Michael T. Mason |
|---|---|---|---|
| **CASE NUMBER** | 05 C 4681 | **DATE** | 12/8/2006 |
| **CASE TITLE** | Hershey vs. PIMCO | | |

**DOCKET ENTRY TEXT**

As stated in further below, Plaintiffs' Motion To Compel Rule 45 Discovery From The Chicago Board Of Trade [160] is granted in part and denied in part. The Chicago Board of Trade must produce responsive discovery before 12/29/06 subject to Hershey and the CBOT entering into a protective order.

■[ For further details see text below.]

Notices mailed by Judicial staff.

---

## STATEMENT

This matter is before the Court pursuant to a Motion to Compel ("Motion") Rule 45 Discovery from the Board of Trade of the City of Chicago ("CBOT" or "Board") [160] filed on behalf of Plaintiffs Breakwater Trading LLC and Richard Hershey (collectively, "Hershey" or "plaintiffs"). After reviewing the Motion, Response and Reply briefs, the Motion is granted in part and denied in part.

In a subpoena issued to the CBOT on March 3, 2006, Hershey sought production of materials in response to Request no. 1 and a portion of Request no.6. Request no.1 seeks production of all large trader report forms ("large trader reports") related to the June 2005 U.S. Ten Year Treasury Note futures contract for the period between April 30 through July 10, 2005. A portion of Request no. 6 seeks written complaints and notes and memos reflecting oral complaints received by the CBOT from May 1 through June 30, 2005 that the June contract was being manipulated or squeezed ("complaints"). We note that in the Reply brief, Hershey limited the discovery requests that it seeks to those set forth above.

The Board is a non-governmental organization and is not a party to this action. The disputed discovery is sought for discovery purposes in connection with plaintiffs' allegations that the defendants manipulated prices of June 2005 U.S. Ten Year Treasury Note futures contracts on the CBOT and the cheapest to deliver U.S.Treasury Note underlying the June 2005 contract in violation of Sections 9(a), 22(a) and 22(a)(1) of the Commodity Exchange Act, 7 U.S.C. §§13(a), 25(a) and 25(a)(1). The Board resists producing the large trader reports and the complaints and argues that the discovery Hershey seeks is overbroad and burdensome to produce. Aside from conclusory statements, the Board has failed to adequately articulate why the discovery requests are overbroad or burdensome to produce. Accordingly, CBOT's objections are overruled.

| | Courtroom Deputy Initials: | KF |
|---|---|---|

**STATEMENT (CONT.)**

The CBOT also argues that the discovery is subject to the qualified investigatory privilege. *See Apex Oil v. DiMauro*, 110 F.R.D. 490 (S.D.N.Y. 1985); *Ross v. Bolton*, 106 F.R.D. 22 (S.D.N.Y. 1985). A governmental body asserting the investigatory privilege must make a specific showing before the court will consider the privilege to have been asserted properly. *In re Sealed Case*, 272 U.S. App. D.C. 314, 856 F.2d 268, 270 (D.C. Cir. 1988) (explaining that in order for the SEC to sustain a claim of investigatory privilege: "(1) there must be a formal claim of privilege by the hand of the department having control over the requested information; (2) assertion of the privilege must be based on actual personal consideration by that official; and (3) the information for which the privilege is claimed must be specified, with an explanation why it properly falls within the scope of the privilege.") (citing *Black v. Sheraton Corp. of America*, 184 U.S. App. D.C. 46, 564 F.2d 531, 542-43 (D.C. Cir. 1977)); *Friedman v. Bache Halsey Stuart Shields, Inc*., 238 U.S. App. D.C. 190, 738 F.2d 1336, 1341-42 (D.C. Cir. 1984)).

Where a non-governmental self-regulatory entity has asserted the investigatory privilege on the basis of the public interest in preserving the ability of self-regulatory bodies to function effectively, these requirements appear to have been applied less rigorously, if at all. *DGM Invs., Inc. v. N.Y. Futures Exchs., Inc*., 224 F.R.D. 133, 139-140 (S.D.N.Y. 2004) (citing *In re NASD*, 1996 U.S. Dist. LEXIS 10101, No. 96-0518, 1996 WL 406826, at *2 (E.D. La. July 18, 1996) (weighing the NASD's assertion of privilege against the movants' need without addressing any of the factors identified in Sealed Case concerning the adequacy of the assertion of privilege); *Ross*, 106 F.R.D. at 24 (reaching the merits and balancing the competing interests without evaluating the sufficiency of the NASD's claim of privilege); *cf. In re Adler, Coleman, Clearing Corp.*, 1999 WL 1747410, at *3 (S.D.N.Y. 1999) (reciting the prerequisites established in Sealed Case but proceeding to a determination without explicitly considering whether the requirements had been met)). Hershey contests the adequacy of the CBOT's assertion of privilege.

In this case, the CBOT asserted that the large trader reports and the complaints are protected by the investigatory privilege because they are obtained in the course of its market surveillance responsibilities. The Board claims that it is crucial to maintain the confidentiality of the information that it obtains in connection with market surveillance in order to encourage market participants to cooperate in providing information to the Board. The CBOT claims that disclosure would hinder the CBOT's ability to obtain the information that it needs from market participants-which is essential to its ability to conduct effective surveillance of its markets. The CBOT additionally argues that Hershey has failed to show an extraordinary need to obtain the disputed discovery or that the disputed discovery is not available from other sources.

There is a "strong public interest in maintaining the integrity of effective industry self-regulation." *Ross*, 106 F.R.D. at 24. This proposition justifies the limited protection for investigative files relating to ongoing investigations, and the rationale for this protection rests in great part on the notion that protection is necessary to encourage cooperation with internal investigations in general, *see, e.g., Apex Oil*, 110 F.R.D. at 496, and to prevent the premature disclosure of factual information or investigative strategy related to a particular ongoing investigation. *See, e.g., In re Adler,* 1999 WL 1747410 at *5. Even if we consider market surveillance to be the equivalent of an ongoing investigation or disciplinary proceeding, the CBOT has not demonstrated why this rationale ought to extend to the large trader reports. Indeed, the CBOT has failed to establish that harm might result as to future investigations if the large trader reports are produced to Plaintiffs, particularly because the reports are not voluntary, but required to be submitted to the CBOT and the CFTC. (Hershey's Reply, p.2, CBOT's Response, p.5). Accordingly, the CBOT has not established that the large trader reports are protected from discovery by the qualified investigatory privilege.

**STATEMENT (CONT.)**

Hershey has demonstrated that they have a particularized need for the large trader reports.[1]  Given the magnitude of this case, the large trader reports will help identify other potential class members and help plaintiffs' experts in the development and preparation of class-wide damage models.  Hershey has narrowed the time period of the requested large trader reports to those received by the CBOT from April 30 through July 10, 2005.  Although Hershey could obtain the same information by issuing subpoenas to approximately 87 CBOT clearing firms, compelling the CBOT to disclose the large trader reports will streamline the discovery process given the short time left to complete discovery.  Therefore, Hershey's Motion is granted as to the large trader reports subject to Hershey and the CBOT entering into a protective order.  CBOT must produce the large trader reports before 12/29/06.

As to the complaints, CBOT argues that it is crucial to maintain the confidentiality of the information that it obtains in connection with market surveillance in order to encourage market participants to cooperate in providing information to the Board and to cooperate with internal investigations in general.  This argument is persuasive.  The CBOT has an interest in both encouraging cooperation and in preventing the premature disclosure of factual information that may jeopardize its efforts in connection with market surveillance.  *See, e.g., In re Adler*, 1999 WL 1747410, at *5.  We will not compel the CBOT to disclose copies of any written complaints or copies of notes or memos of oral complaints.  The Motion is denied as to the complaints.

---

[1]As this Court understands it, the large trader reports contain data not analysis or opinion.